Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IX

| INGRID RODRÍGUEZ COSME<br><br>Apelante<br><br>v.<br><br>BOYS & GIRLS CLUB OF PUERTO RICO, INC.<br><br>Apelada | KLAN202300993 | *Apelación* procedente del Tribunal de Primera Instancia Sala Superior de San Juan<br><br>Caso Núm.: SJ2020CV03448<br><br>Sobre: Despido Injustificado |
|---|---|---|

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Salgado Schwarz y el Juez Ronda Del Toro.

Rodríguez Casillas, juez ponente.

### SENTENCIA

En San Juan, Puerto Rico, a 13 de marzo de 2024.

Comparece ante nos la Sra. Ingrid Rodríguez Cosme (en adelante, "señora Rodríguez Cosme o apelante"), para que revoquemos la *Sentencia* emitida el 24 de octubre de 2023 y notificada el 25 de octubre de 2023, por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante, "TPI"). Mediante dicho dictamen, desestimó todas las causas de acción de la Sra. Rodríguez Cosme.

Perfeccionado el recurso de apelación, procedemos a **confirmar** la *Sentencia* apelada. **Veamos.**

-I-

El **6 de julio de 2020**, la señora Rodríguez Cosme radicó una *Querella* contra de Boys & Girls Club of PR, Inc., (en adelante, "Boys & Girls, BGCPR o apelado") por discrimen y hostigación por razón de su género. Adujo, que fueron tomadas acciones en represalias en su contra y el despido fue sin justa causa, en violación a las leyes

número 69, 80 y 115, supra.[1] En específico, la apelante alegó que el 4 de junio de 2018 comenzó a trabajar como "Senior Case Manager" del Proyecto Vimenti, en la escuela Vimenti Ramos Antonini, una escuela operada y administrada por Boys & Girls. Desde mediados del 2018, su supervisor, el señor Wilfredo Damiani, comenzó a tomar represalias en su contra, por lo que radicó una queja interna de acoso laboral y discrimen por razón de género.[2]

En respuesta, el **10 de agosto de 2020**, Boys & Girls radicó su *Contestación a la Querella.*[3] En síntesis, arguyó que la señora Rodríguez Cosme no se desempeñó adecuadamente, violando los procedimientos, instrucciones y normas operacionales. Añadió que el despido se hizo para proteger la operación adecuada y segura de la empresa. Indicó que mientras la apelante fue su empleada no presentó queja de discrimen y sí se atendieron las quejas por alegado trato hostil. Apuntó que fue la querellante quien informó expresamente que no tenía interés de continuar.[4]

El **18 de agosto de 2021**, Boys & Girls radicó una *Moción de Sentencia Sumaria.*[5] Alegó que existen hechos incontrovertidos que demuestran que la señora Rodríguez Cosme provocó un ambiente incómodo en el empleo, promovía relaciones conflictivas, incumplía con sus funciones y se negó categóricamente a participar en un plan de mejoramiento con el fin de optimizar sus relaciones de trabajo. También indicó que no existía proximidad temporal entre la alegada actividad protegida y el despido, que ocurrió cuatro meses (4) después de esta haber presentado su última queja. Por lo cual, no se puede establecer un nexo causal entre la presentación de la queja

---

[1] Anejo 2 de la *Apelación,* págs. 41 – 45.
[2] *Íd.*
[3] Anejo 3 de la *Apelación,* págs. 46 – 53.
[4] *Íd.*
[5] Anejo 4 de la *Apelación,* págs. 54 – 1645.

contra su supervisor y la alegada acción adversa, por lo tanto, la apelante no estableció un caso *prima facie* de represalias.[6]

Por su parte, el **18 de octubre de 2021** la señora Rodríguez Cosme radicó una *Oposición a Moción de Sentencia Sumaria,*[7] en la que alegó que nunca se tomó acción disciplinaria en su contra hasta su despido. Adujo, además, que las acciones y omisiones de su supervisor, el señor Wilfredo Damiani, crearon un ambiente hostil de trabajo por motivo de género que afectó negativamente su condición emocional.[8]

El **17 de noviembre de 2021**, Boys & Girls radicó una *Réplica a Oposición a Moción de Sentencia Sumaria.*[9] Indicó que la apelante incumplió con la Regla 36.3 de Procedimiento Civil,[10] y sostuvo que le corresponde al TPI admitir los hechos incontrovertidos. Reiteró que la señora Rodríguez Cosme fue despedida por su pobre desempeño e incumplimiento con las funciones esenciales de su puesto de trabajo.

El **24 de octubre de 2023** y la notificada el 25 de octubre de 2023, el TPI dictó una *Sentencia* en la que realizó las siguientes determinaciones de hechos materiales no controvertidos:

1. *El 1 de junio de 2018, Ingrid Rodríguez firmó el contrato de empleo con BGCPR para ocupar el puesto de "Senior Case Manager" en la Escuela Vimenti.*
2. *El 4 de junio de 2018, Ingrid Rodríguez comenzó su empleo como "Senior Case Manager".*
3. *Ingrid Rodríguez lideró el programa de manejo de casos y de familia de la Escuela Vimenti, que es un modelo de dos generaciones enfocado en dar servicios a niños y padres.*
4. *La Escuela Vimenti es la primera escuela pública "Charter" en Puerto Rico y se diseñó utilizando el enfoque de "Dos Generaciones".*
5. *El enfoque de Dos Generaciones es una iniciativa contra la pobreza que proporciona apoyo tanto a los niños como a los padres. Este enfoque ha demostrado ser eficaz para liberar a los niños y a sus familias de las trampas de la pobreza y empoderarlos para que desarrollen todo su potencial. Este enfoque permite a los padres y a sus hijos recibir servicios, apoyo y oportunidades de aprendizaje y*

---

[6] *Íd.*
[7] Anejo 5 de la *Apelación,* págs. 1646 – 1802.
[8] *Íd.*
[9] Anejo 6 de la *Apelación,* págs. 1803 – 1858.
[10] 32 LPRA Ap. V, R. 36.3.

*empoderamiento, todo en la dirección de ayudar a las familias a lograr la movilidad económica.*

6. *La Escuela Vimenti comenzó sus operaciones en agosto de 2018.*

7. *Las operaciones de la Escuela Vimenti comenzaron con posterioridad a la contratación de la querellante.*

8. *Mediante su contrato de empleo, Ingrid Rodríguez aceptó y reconoció que, como condición esencial de su contrato de empleo, esta debía observar todas las normas y los reglamentos establecidos y que, de vez en cuando, BGCPR estableciera.*

9. *El 1 de junio de 2018, BGCPR le entregó copia a Ingrid Rodríguez del Manual de Políticas y Procedimientos de Recursos Humanos de BGCPR ("Manual de Empleados") y el Código de Ética de BGCPR.*

10. *Ingrid Rodríguez se comprometió con cumplir cabalmente con las disposiciones del Manual de Empleado.*

11. *El Manual de Empleados contiene una política de Hostigamiento en el Empleo que prohíbe todo tipo de represalia en contra de un líder por haber presentado algún tipo de queja por discrimen u hostigamiento.*

12. *El Manual de Empleados contiene una política de Igualdad de Oportunidad en el Empleo que prohíbe el discrimen y el hostigamiento por razón de raza, color, edad, religión, sexo, origen o condición social, matrimonio, ideas políticas o afiliación política, origen nacional, impedimento físico o mental, condición de veterano de Vietnam o veterano incapacitado o por ser víctima o ser percibido como víctima de violencia doméstica, agresión sexual o acecho en todos los aspectos relacionados al empleo.*

13. *La Política de Igualdad de Oportunidad en el Empleo impone el deber al empleado de notificar inmediatamente al Departamento de Recursos Humanos si cree que se ha cometido algún discrimen u hostigamiento en contra de usted u otra persona, y si, por haberse quejado, ha recibido acciones en represalias.*

14. *La política de Puertas Abiertas contenida en el Manual de Empleados de BGCPR establece un procedimiento de quejas que le permite al empleado presentar su queja o querella a Recursos Humanos o a "cualquier miembro de la gerencia, con quien tenga más confianza, sin temor a represalias".*

15. *Las Reglas de Conducta del Manual de Empleado definen como ofensa grave faltarle el respeto a un supervisor u oficial de BGCPR, negarse a realizar el trabajo o cualquier tarea asignados a su posición, no seguir las instrucciones dadas por el Supervisor y observar un patrón de conducta impropia o desordenada, entre otros. Por su gravedad e impacto negativo en las operaciones de BGCPR, dichas conductas pueden conllevar el despido inmediato.*

16. *Además, las Reglas de Conducta disponen que el trabajar sin armonía o falta de cooperación con sus compañeros/as de trabajo, dejar de ponchar su tarjeta de asistencia ("time card") o de completar cualquier documento según requerido, y desempeñar el trabajo en forma ineficiente o hacerlo tardía y negligentemente o en violación a las normas de validad del servicio que presta BGCPR, pudiese conllevar acción disciplinaria, incluyendo el despido.*

17. *El Manual de Empleados contiene el Código de Ética de la Organización.*

18. *El cumplimiento con el Código de Ética es condición de empleo para cada empleado.*

19. *El Código de Ética requiere que los empleados mantengan en todo momento un ambiente de trabajo positivo y*

*dirigido a alcanzar las metas trazadas por medio de sus relaciones dentro de BGCPR.*

20. *El supervisor directo de Ingrid Rodríguez era el Director del Área Social, Wilfredo Damiani.*

21. *Wilfredo Damiani comenzó a trabajar para BGCPR en marzo de 2009.*

22. *Desde que Wilfredo Damiani comenzó a trabajar para BGCPR, este ha ocupado la posición de Coordinador Educativo, Director del Club de Ernesto Ramos Antonini, Gerente de Área, Director del Proyecto Ernesto Ramos Antonini, que posteriormente fue llamado "Vimenti", y Director de Área Social de Vimenti.*

23. *Wilfredo Damiani supervisa los grupos de trabajo del área de manejo de casos, que actualmente se compone por una manejadora de casos senior y dos (2) manejadores de casos ("trabajadores sociales"); y del área de salud, que se compone por una coordinadora de salud y dos (2) enfermeras.*

24. *Wilfredo Damiani únicamente ejerce supervisión directa sobre los puestos de "Senior Case Manager" y Coordinadora de Salud.*

25. *BGCPR notificó a Ingrid Rodríguez una copia de la descripción de su puesto que contiene las funciones y deberes correspondientes al puesto de Senior Case Manager, así como de las destrezas requeridas para ocupar dicho puesto.*

26. *Ingrid Rodríguez fue contratada por BGCPR como Senior Case Manager por su pericia en Trabajo Social, y estaba encargada de desarrollar los procesos y protocolos para el área de manejo de casos.*

27. *Como parte de las funciones de Ingrid Rodríguez, éste debía llevar a cabo intervenciones o entrevistas con las familias de Vimenti mediante las cuales hacía un análisis biopsicosocial y económico de éstas, identificaba sus necesidades y les proveía seguimiento para medir el progreso familiar.*

28. *Como parte de las funciones de Ingrid Rodríguez, ésta debía preparar y mantener al día los expedientes de cada familia.*

29. *Como parte de las funciones de Ingrid Rodríguez, ésta debía preparar unos informes mensuales sobre el progreso de cada familia, y entregar dicho informe a su supervisor dentro de los primeros 5 días del mes siguiente a las evaluaciones.*

30. *Los informes mensuales que preparaba Ingrid Rodríguez documentaban el estado actual de cada familia, e informaban sobre si esta progresó o empeoró comparado con la evaluación anterior que hubiera hecho.*

31. *Como parte de las funciones asignadas a Ingrid Rodríguez, estaba diseñar los procedimientos y metodologías de las intervenciones familiares.*

32. *Wilfredo Damiani también solicitó la asistencia de Ingrid Rodríguez para la revisión del Protocolo de Manejo de Conducta y Adaptación Social.*

33. *Entre las funciones de Ingrid Rodríguez se encontraba preparar los planes familiares.*

34. *Como parte de las funciones de Ingrid Rodríguez se encontraba referir a las familias a recursos externos, y asistirlos en acudir o acceder dichos recursos externos, según las necesidades que cada familia tuviese.*

35. *Como parte de las funciones de Ingrid Rodríguez se encontraba manejar la seguridad y situaciones de emergencia siguiendo los protocolos y políticas organizacionales.*

36. *Como parte de las destrezas que se le requerían a Ingrid Rodríguez se encontraba la adaptación a situaciones cambiantes.*

37. *Las funciones de Ingrid Rodríguez no se limitaban únicamente a las que se desprendían directamente de la descripción de puesto, sino que comprendían también aquellas que fuesen solicitadas por sus superiores, y que vayan a tono con el puesto que ocupaba.*

38. *Cada unidad de trabajo dentro de Vimenti, ya sea la Escuela Vimenti, el Programa de "After-School", Planta Física y Operaciones necesitan continuamente rendir informes relacionados con las tareas realizadas, el impacto y los resultados de los trabajos.*

39. *Los informes son fundamentales porque el Proyecto Vimenti es un modelo basado en evidencia, y las decisiones que se toman en el Proyecto están basadas en datos.*

40. *Vimenti rinde cuentas continuamente tanto a las entidades gubernamentales, como a los donantes.*

41. *A Ingrid Rodríguez se le informó, y ésta conocía, que los informes mensuales debían ser entregados en o antes de los primeros cinco días del mes siguiente.*

42. *Ingrid Rodríguez admitió que los datos que se obtenían de los informes eran necesarios para la junta ejecutiva de Vimenti, la gerencia y su supervisor para conocer el estado de sus familias.*

43. *Aparte de los formularios escritos de Evaluaciones de Desempeño, Wilfredo Damiani se reunía frecuentemente con Ingrid Rodríguez para discutir su desempeño.*

44. *El 28 de agosto de 2018, Wilfredo Damiani llevó a cabo una reunión de seguimiento con Ingrid Rodríguez. En esta, se le comentó a Ingrid Rodríguez "la importancia de poder mantener un manejo adecuado cuando reacciona a informaciones que se brindan en el pleno del equipo".*

45. *El 5 de octubre de 2018, Ingrid Rodríguez le envió un correo electrónico a Wilfredo Damiani expresando que "el trato de nuestra conversación de hoy fue inadecuado, Entiendo que un todo de voz fuerte e irónico no aporta en nuestra comunicación. Me gustaría mucho que podamos mejorar nuestra comunicación y juntos laboremos como equipo."*

46. *Lizzette Díaz, quien formaba parte del personal de Recursos Humanos de BGCPR atendió las expresiones de Ingrid Rodríguez sobre el trato de Wilfredo Damiani en su correo electrónico del 5 de octubre de 2018.*

47. *El 9 de octubre de 2018, Lizzette Díaz le cursó un correo electrónico a Bárbara Rivera, mediante el cual le solicitó que convocara una reunión con Ingrid Rodríguez y Wilfredo Damiani para trabajar el asunto sobre las inquietudes comunicadas por Ingrid Rodríguez.*

48. *El 15 de octubre de 2018, Bárbara Rivera convocó una reunión con Wilfredo Damiani e Ingrid Rodríguez para atender el asunto del correo electrónico enviado por Ingrid Rodríguez el 15 de octubre de 2018.*

49. *En la reunión del 15 de octubre de 2018, se conversó sobre la inquietud que tenía Ingrid Rodríguez sobre cómo se había sentido con su supervisor, se clarificó el asunto, y se propusieron acciones para trabajar la relación entre Wilfredo Damiani y esta.*

50. *En la reunión del 15 de octubre de 2018, se acordó que Wilfredo Damiani e Ingrid Rodríguez comenzarían a tener reuniones individuales semanalmente de manera que pudieran definir mejor los roles y eliminar barreras. Se indicó, además, que estas reuniones ocurrirían con todos los miembros del equipo.*

51. *El 23 de octubre de 2018, Wilfredo Damiani se reunió nuevamente con Ingrid Rodríguez. En esta reunión, Wilfredo Damiani comentó que: "[s]upervisión – es un área que tiene que trabajar más."*

52. *Durante la reunión del 23 de octubre de 2018, Ingrid Rodríguez acordó entregar la evaluación de su supervisada Tania Abreu el 29 de octubre de 2018, entregar el perfil familiar en o antes del 31 de octubre de 2018, entregar el perfil familiar en o antes del 31 de octubre de 2018, y tener listo el Plan Familiar y la discusión de este para el 30 de noviembre de 2018.*

53. *El 31 de octubre de 2018, Wilfredo Damiani le notificó a Ingrid Rodríguez que debía mejorar el autocontrol de emociones y reacciones a información que le sea provista. Se le señaló, como ejemplo, una situación ocurrida con Bárbara Rivera el 25 de octubre de 2018, en donde la querellante hizo un comentario inapropiado en plena reunión, frente a los demás empleados.*

54. *El 4 de diciembre de 2018, Wilfredo Damiani llevó a cabo otra reunión con Ingrid Rodríguez. En esta, se le señaló a Ingrid Rodríguez que no cumplió con la entrega y discusión de los planes familiares que estaban pautados para el 30 de noviembre de 2018. Asimismo, se le señaló que incumplió con la evaluación de su supervisada Tania Abreu que estaba pautada para el 29 de octubre de 2018.*

55. *Los perfiles familiares siempre se trabajan para que estén en o antes de que culmine el último trimestre.*

56. *En múltiples reuniones Wilfredo Damiani discutió junto con la Coordinadora de Salud e Ingrid Rodríguez los procesos y las fechas de entrega de los informes.*

57. *Wilfredo Damiani discutió con Ingrid Rodríguez la importancia de tener el perfil familiar de las familias de Vimenti, toda vez que con ese documento BGCPR trabajaba los planes de acción y los seguimientos de la familia.*

58. *El 29 de enero de 2019 se llevó a cabo una Evaluación de Desempeño en la cual Ingrid Rodríguez obtuvo una puntuación de 2.64/4.00 que representa que no alcanzó algunas de las expectativas de la Organización.*

59. *En la Evaluación de Desempeño de 29 de enero de 2019 se le señaló a Ingrid Rodríguez como área de mejora que debía trabajar con mejorar la comunicación entre ella y su supervisada, su conexión con la comunidad de Vimenti, su proactividad en la interacción con las familias y atención de sus necesidades, su adaptación a cambios, y la entrega de informes en las fechas acordadas.*

60. *El 26 de septiembre de 2019, Wilfredo Damiani llevó a cabo una reunión de seguimiento con Ingrid Rodríguez. En esta, Ingrid Rodríguez expresó que los planes familiares no estarían completados para la fecha proyectada de 30 de septiembre de 2019 debido a las situaciones de seguridad y las inclemencias del clima. De este modo, acordaron que los informes se finalizarían para en o antes del 18 de octubre de 2019.*

61. *En la reunión del 26 de septiembre de 2019, Ingrid Rodríguez y Wilfredo Damiani acordaron que los informes narrativos y de intervenciones se entregarían en o antes de los primeros 5 días laborables del próximo mes.*

62. *El 31 de octubre de 2019, Wilfredo Damiani sostuvo uno reunión de seguimiento con Ingrid Rodríguez.*

63. *En la reunión del 31 de octubre de 2019, Wilfredo Damiani le indicó a Ingrid Rodríguez que "este año debemos trabajar para que todos los documentos de información y/o datos estén listo y entregados para las fechas debidamente acordadas".*

64. *En la reunión del 31 de octubre de 2019, Ingrid Rodríguez reconoció que en por lo menos dos ocasiones no cumplió con la política de ponchar.*

65. *En la reunión del 31 de octubre de 2019, Ingrid Rodríguez indicó que no estaba cumpliendo con la entrega de los informes a tiempo debido a situaciones de seguridad que habían atrasado los procesos.*

66. *Ingrid Rodríguez reconoció y aceptó que por lo menos en dos ocasiones se le indicó que debía mejorar la adaptación a cambios y la manera en reaccionaba a los cambios.*

67. *Ingrid Rodríguez reconoció y aceptó que, durante su empleo con BGCPR, se le indicó que tenía que trabajar el autocontrol de emociones y sus reacciones durante reuniones grupales.*

68. *El 10 u 11 de septiembre de 2019, Ingrid Rodríguez presentó una queja a Yezaida Reyes de Recursos Humanos debido a que consideraba que el trato por parte de Wilfredo Damiani se había vuelto insostenible debido a que este se burlaba de ella y hacía comentarios inapropiados.*

69. *Cuando se le preguntó a Ingrid Rodríguez qué comentarios burlones le hacía Wilfredo Damiani, esta respondió que, en una ocasión, este indicó que tiraría una moneda al aire para determinar a quién iba a enviar para atender un equipo de Estados Unidos que estaría visitando BGCPR. Ingrid Rodríguez entendió que ese comentario fue inapropiado.*

70. *Ingrid Rodríguez también se quejó de que Wilfredo Damiani le impartía instrucciones a su supervisada sin antes comunicárselo.*

71. *Ingrid Rodríguez también se quejó de que su supervisor le asignaba tareas adicionales a las que ya tenía.*

72. *El 5 de marzo de 2020, Ingrid Rodríguez le escribió un correo electrónico a Iris López expresando que la situación con Wilfredo Damiani se tornó insostenible. El correo electrónico dispone que:*

*Recurro a este email para informarle que la situación laboral con mi supervisor se ha vuelto insostenible. En el día de ayer este me solicitó un informe de manera muy inapropiada y denigrante. Entre otras situaciones, cómo invadir mi oficina en una intervención clínica de carácter confidencial, brindarle instrucciones a mi equipo sin consultarme, pedirle trabajo sin acordar conmigo, burlarse de mi cuando hago una pregunta. Esto me ha ocasionado daño emocional, llanto frecuente, ansiedad y tristeza. Soy una profesional con más de 20 años de experiencia en mi campo y mi experiencia, nunca he recibido un trato tan denigrante. Est[a] relación tan difícil la he tratado de manejar desde un inicio, cómo dialogamos en diciembre esto tiene un historial, he puesto de mi parte para mejorar y tratar de entenderlo, pero no lo logro. Por el contrario, todo ha ido escalando. Mi mayor compromiso son mis familias y por eso me presento a completar mi trabajo y no renuncio de manera inmediata. Pero una vez complete mi labor por este año me despediré de Vimenti. Es mi interés el que ustedes manejen esta situación, ya mis compañeras conocen del acoso y el deterioro de la relación laboral y esto tampoco está bien ya que es desmoralizante a su vez para ellas. Estoy considerando buscar ayuda emocional ya que debo reponerme por mí y mi familia la cual no voy a descuidar. Añado que ayer, cuando pasó por mi oficina no la abordé sobre esto pq [sic] la noté muy ocupada y yo estaba en un proceso de supervisión, pero a su vez necesitaba coordinar con usted lo de mi práctica clínica. Le*

*agradecería que intervenga lo más pronto posible. Es muy difícil lo que estoy viviendo.*

73. *Ingrid Rodríguez entendió que las expresiones "burlonas" consistieron en que Wilfredo Damiani le repetía las cosas lentamente, le hablaba como si fuese una niña pequeña, y hacía expresiones tales como "Ay Dios mío, ¿cómo quieres que te lo explique?".*

74. *El 5 de marzo de 2020, Iris López contestó el correo de Ingrid Rodríguez. En este dispuso que:*

    *Estimada Ingrid,*

    *La conducta y sucesos que describes en el escrito no está a tono con las expectativas de la organización en cuanto a comunicaciones y reclamaciones entre empleados, supervisados y supervisores. Lamento mucho que a pesar de las múltiples gestiones que la organización ha realizado en diferentes ocasiones al atender las quejas que has presentado sobre el tema, y de la atención que se le ha brindado al asunto mediante investigaciones, conversaciones, reuniones y planes de acción, aun continúen dándose estas dinámicas, según planteado en esta comunicación.*

    *Te informo además que luego de nuestra conversación en el mes de diciembre, la situación presentada se atendió en aquel momento. Queremos conocer sobre el suceso nuevo que describes e identificar como podemos ayudarte. Tu labor es importante para nosotros y apreciamos las aportaciones que realizas como miembro vital de nuestro equipo de trabajo.*

    *Separemos un momento mañana a las 10:00 a.m. para conversar e identificar opciones y alternativas que puedan ayudarte a estar bien realizando el trabajo que te apasiona. Por favor, confirma tu disponibilidad para este espacio. Copio a nuestra Directora de Operaciones, Lola Yglesias para que también nos acompañe a esta conversación.*

75. *El 6 de marzo de 2020, Iris López y Lola Yglesias se reunieron con Ingrid Rodríguez para entrevistarla y atender el correo electrónico del 5 de marzo de 2020.*

76. *Iris López preparó un informe titulado "Investigation Summary Report" (en adelante, el "Informe") debido a las alegaciones de Ingrid Rodríguez. La investigación comenzó el 6 de marzo de 2020 y culminó el 13 de marzo de 2020.*

77. *Según el Informe, las personas entrevistadas como parte de la investigación negaron presenciar un acto hostil, tono inapropiado, conducta denigrante, hostil de acoso por parte de Wilfredo Damiani hacia Ingrid Rodríguez.*

78. *Según el Informe, tres de las personas entrevistadas con interacción directa y continua con Ingrid Rodríguez y Wilfredo Damiani indicaron que las diferencias que han tenido surgen de molestias de Rodríguez por instrucciones de trabajo que da Damiani al equipo.*

79. *Según el Informe, Ingrid Rodríguez "nunca pudo generar un ejemplo concreto de una acción hostil, denigrante o burlona de Damiani hacia ella… Por lo tanto, no se sostienen las alegaciones de Rodríguez sobre acoso y ambiente hostil".*

80. *Según el Informe, no son acciones impropias que Wilfredo Damiani le brinde instrucciones al equipo de trabajo sin consultarle a Ingrid Rodríguez debido a que su acción está alineada a la expectativa del rol de un director de área.*

81. *Según el Informe, BGCPR le presentaría los resultados de la investigación a Ingrid Rodríguez, indicado que:*

    a. *De los hallazgos de la investigación surge que ella no está cumpliendo con las expectativas de conducta de la organización,*

    b. *Que es la conducta de ella la que está siendo adversa al equipo de trabajo.*

    c. *Se procederá a clarificar los roles, deberes y responsabilidades.*

    d. *Que además no está cumpliendo con las solicitudes de reportes e información importante que se le solicita como parte de sus responsabilidades, es decir no está cumpliendo con su trabajo.*

    e. *Que a consecuencia de estos hallazgos su conducta y desempeño no cumplen las expectativas de la organización por lo cual se iniciará un plan de mejoramiento que debe cumplir.*

    f. *Que de no cumplir satisfactoriamente este plan no podrá continuar trabajando para la organización.*

    g. *Que en otras ocasiones la organización ha intervenido de buena fe para atender sus quejas previas y que nuevamente lo haremos para facilitar el proceso de transición anunciado. Se presentará la opción de un relevo con el pago de una suma equivalente a la mesada por ley 80, luego de la reforma, y un porciento en consideración a ADEA.*

    *[…]*

    h. *Clarificación de valores organizacionales, conducta de líderes y expectativas de la organización respecto al trabajo colaborativo.*

    i. *Planificar diálogos de conciliación con un seguimiento bisemanal.*

    j. *Capacitación:*
        i. *Ingrid Rodríguez – comunicación e inteligencia emocional*
        ii. *Wilfredo Damiani – técnicas de supervisión efectiva, desarrollo mediante "coaching".*

82. *Iris López y Lola Yglesias le notificaron a Ingrid Rodríguez que se llevó a cabo una investigación sobre las alegaciones en contra de Wilfredo Damiani.*

83. *Iris López y Lola Yglesias le notificaron a Ingrid Rodríguez que como parte de la investigación se hicieron entrevistas a Tania Abreu, Zuania Rivera, Melizza Reyes, Melany López y Wilfredo Damiani.*

84. *Iris López y Lola Yglesias le notificaron a Ingrid Rodríguez que, de los hallazgos de la investigación, las personas entrevistadas indicaron que fue ella quien creó un ambiente incómodo.*

85. *Durante la reunión, Lola Yglesias le preguntó a Ingrid Rodríguez sobre alternativas para poder mejorar la relación con Wilfredo Damiani y el ambiente de trabajo para desarrollar un Plan de Mejoramiento. Ingrid Rodríguez sostuvo que no tenía nada más que hacer pues ya lo había intentado todo y ya no tenía herramientas.*

86. *La línea Tu Bienestar Vimenti se creó debido a la necesidad de continuar los servicios de salud y bienestar en las comunidades pobres o de bajos recursos como lo es la Comunidad de Residencial Ernesto Ramos Antonini durante la Pandemia.*

87. *Los objetivos de la Línea Tu Bienestar Vimenti eran preservar el ofrecimiento de servicios de salud y bienestar gratuitos a la comunidad Vimenti, con un enfoque educativo y de orientación en la prevención de enfermedades.*

88. *Ingrid Rodríguez le indicó al Sr. Wilfredo Damiani que, para estar en cumplimiento con la Ley, BGCPR debería capacitar al personal que participaría en la Línea Tu Bienestar Vimenti.*

89. *Luego de que Ingrid Rodríguez expresó su preocupación sobre la capacitación a Wilfredo Damiani, esta comenzó a*

*identificar talleres de capacitación para ofrecerle a las manejadoras de caso y a diseñar la metodología.*

90. *Wilfredo Damiani entendió que las preocupaciones de Ingrid Rodríguez con respecto a la Línea Tu Bienestar Vimenti eran legítimas, por lo que comenzaron a buscar formas de cómo mejorar y estar preparados.*

91. *Ingrid Rodríguez declaró que Wilfredo Damiani discriminó en su contra por razón de sexo debido a que hizo comentarios sexistas.*

92. *Ingrid Rodríguez declaró que entre los comentarios sexistas que hizo Wilfredo Damiani es que, este (1) no quería trabajadoras sociales en tacos, sino en tenis y; (2) que deseaba reclutar un trabajador social hombre y no una trabajadora social mujer.*

93. *Ingrid Rodríguez nunca presentó una queja en BGCPR sobre discrimen por razón de sexo.*

94. *Vimenti tiene una política de vestimenta que prohíbe el uso de tacones en el trabajo, y requiere que los empleados utilicen zapatos cerrados.*

95. *Ingrid Rodríguez reconoce que, aunque Wilfredo Damiani entrevistó hombre para el puesto de manejador de casos, se terminó contratando a una mujer.*

96. *La persona que reclutó a Ingrid Rodríguez era mujer.*

97. *Ingrid Rodríguez desconoce quien tomó la determinación de despedirla.*

98. *Wilfredo Damiani no participó del proceso previo a la terminación de empleo de Ingrid Rodríguez.*

99. *Wilfredo Damiani nunca fue consultado con respecto a la toma de decisión de despedir a Ingrid Rodríguez.*

100. *Wilfredo Damiani nunca emitió una recomendación relacionada con el despido de Ingrid Rodríguez.*

101. *A Wilfredo Damiani nunca se le solicitó, ni este preparó, un informe para que BGCPR tomara la determinación de si se despedía o no a Ingrid Rodríguez.*

102. *Lola Yglesias e Iris López le comunicaron a Ingrid Rodríguez sobre la determinación de despedirla.*

103. *Ingrid Rodríguez fue despedida el 29 de junio de 2020.*

104. *Wilfredo Damiani no estuvo presente en la reunión mediante la cual le notificaron el despido a Ingrid Rodríguez.*

105. *Luego del despido de la Ingrid Rodríguez, el puesto de Senior Case Manager fue ocupado por Tania Abreu.*

106. *Luego del despido de la Ingrid Rodríguez, tanto en BGCPR como en Vimenti permanecieron trabajando otras mujeres.*

107. *Las dos ocasiones en que Ingrid Rodríguez visitó un psicólogo, fue bajo el Programa de Asistencia del Empleado, por recomendación y referido de BGCPR.*

108. *La primera instancia en que Ingrid Rodríguez visitó un psicólogo fue para septiembre del 2019, como consecuencia de haber presenciado un tiroteo en la comunidad donde ésta trabajaba. Solamente asistió a una cita del Programa de Asistencia al Empleado (PAE) relacionada con estos eventos.*

109. *Luego de su despido de BGCPR, Ingrid Rodríguez no ha visitado ningún psicólogo o psiquiatra.*

110. *Ingrid Rodríguez nunca ha sido diagnosticada con alguna condición o trastorno mental.*

111. *Ingrid Rodríguez nunca ha sido diagnosticada con depresión.*

112. *Ingrid Rodríguez nunca ha sido diagnosticada con ansiedad.[11]*

---

[11] Anejo 1 de la *Apelación*, págs. 5 – 20.

Así, se declaró *Ha Lugar* la *Moción de Sentencia Sumaria* y desestimó el caso.[12]

El **6 de noviembre de 2023**, la señora Rodríguez Cosme acudió ante esta Curia e imputó la comisión de los siguientes errores:

> ***PRIMER SEÑALAMIENTO DE ERROR:*** *Erró el TPI, en su conclusión relacionada a que el despido de la apelante fue justificado, debido a que es un hecho material en controversia, si el despido de la apelante fue por alegadas deficiencias en su desempeño, por motivo a supuestamente entregar tardíamente los planes de trabajo e informes de familias, o si por el contrario, el despido de la Apelante, fue en represalias por la queja presentada por la apelante en contra de su supervisor, el 5 de marzo del 2020, menos de 4 meses antes de ser despedida por la Sra. Yglesias y la Sra. Rivera, quienes admitieron que nunca evaluaron el desempeño de la apelante, que no tenían ningún conocimiento acerca del desempeño de la apelante, y que nadie, nunca, se había quejado del desempeño de la apelante. La apelante nunca había sido disciplinada, y que al momento del despido, no había ningún documento que reflejara que la apelante tenía problemas de desempeño, y la última evaluación de desempeño de la apelante reflejaba que esta cumplía con las expectativas de la apelada para su posición. Inclusive el propio supervisor de la apelante, el Sr. Damiani, admitió que nunca había disciplinado a la apelante por ningún tipo de problema de desempeño, y que nadie, nunca, se había quejado del desempeño de la apelante. Ante lo anterior, erró el TPI en su conclusión de que el despido de la apelante por la Sra. Yglesias y por la Sra. Rivera, como primera y única acción disciplinaria en contra de esta, fue justificado, y no fue uno en represalias por las actividades protegidas de la apelante y en violación a las leyes Núm. 80 y 115.*

> ***SEGUNDO SEÑALAMIENTO DE ERROR:*** *Erró el TPI, al dictar Sentencia y concluir que la apelante no pudo establecer su causa de acción de hostigamiento, discrimen, y ambiente hostil, por razón de su género, en violación a la ley Núm. 69, debido a que no sufrió una acción adversa, debido a que su despido fue justificado, lo cual es un error y un hecho en controversia, y no empece a que la apelante estableció que las acciones tomadas por su supervisor, Damiani, en su contra, entre estas: comentarios denigrantes hacia las mujeres de que no servían y que prefería trabajar con hombres, así como la forma y manera denigrante y hostil en que Damiani se refería a la apelante, por su género, causaron que esta tuviese que ser referida al programa de ayuda del empleado de la apelada, PAE, para recibir tratamiento psicológico por tales acciones. Ante lo anterior, y contrario a lo resuelto por el TPI, la apelante fue víctima, de parte de su supervisor, de diferentes acciones adversas por su género, que afectaron sus condiciones de empleo y su condición emocional y que además tuvieron el efecto de crear un ambiente hostil de trabajo, en violación a la Ley Núm. 69, por lo que erro [sic] el TPI en su conclusión de que la Apelante no pudo establecer una causa de acción de discrimen, hostigamiento y ambiente hostil, bajo la Ley Núm. 69, debido a que no se tomaron acciones*

---

[12] *Íd.*, págs. 1 – 40.

*adversas por motivo a su género, lo cual son hechos materiales en controversia.*

***TERCER SEÑALAMIENTO DE ERROR:*** *Erró el TPI, en su conclusión de que Rodríguez no estableció su causa de acción de represalia al amparo de la Ley Núm. 115, no empecé [sic] a que la apelante estableció que se quejó de su supervisor, Damiani, el 5 de marzo del 2020, y que fue despedida, el 29 de junio del 2020, por lo que aun el TPI concluyendo que había proximidad temporal entre la queja de Rodríguez y su despido, el TPI concluyo [sic] que Rodríguez no pudo establecer su causa de acción de represalias debido a que el despido de Rodríguez fue por alegadamente no entregar los informes y planes de trabajo a tiempo, lo cual son hechos materiales en controversia, y no en represalias por su quejas [sic], entre estas las del 5 de marzo del 2020, en violación a la Ley Núm.. [sic] 115, supra, lo cual es un error.*

Luego de varios trámites, el **6 de diciembre de 2023** el apelado presentó su *Alegato en Oposición a Recurso de Apelación Civil.*

**-II-**

**-A-**

La Regla 36 de Procedimiento Civil regula el mecanismo procesal de la sentencia sumaria, cuyo propósito principal es facilitar la solución justa, rápida y económica de casos civiles que no presentan controversias genuinas o reales sobre hechos materiales y esenciales.[13]

En ese sentido, se considera un hecho material esencial *"aquel que puede afectar el resultado de la reclamación de acuerdo al derecho sustantivo aplicable".*[14] Por lo tanto, procederá dictar una sentencia sumaria:

> *[S]i las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia, demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que [,] como cuestión de derecho[,] el tribunal debe dictar sentencia sumaria a favor de la parte promovente.*[15]

Es decir, este mecanismo podrá ser utilizado en situaciones en las que la celebración de una vista o del juicio en su fondo

---

[13] 32 LPRA Ap. V, R. 36.3 (e); *Bobé v. UBS Financial Services*, 198 DPR 6, 19 – 20 (2017).
[14] *S.L.G. Szendrey-Ramos v. Consejo de Titulares*, 184 DPR 133, 167 (2011).
[15] Regla 36.3 (e) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3 (e).

resultare innecesaria, debido a que el tribunal tiene ante su consideración todos los hechos necesarios y pertinentes para resolver la controversia y solo le resta aplicar el derecho.[16]

De manera que, un asunto no debe ser resuelto por la vía sumaria cuando:

> *(1) existen hechos materiales y esenciales controvertidos; (2) hayan alegaciones afirmativas en la demanda que no han sido refutadas; (3) surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material y esencial, o (4) como cuestión de derecho no procede.[17]*

La precitada regla establece los requisitos de forma que debe satisfacer toda solicitud de sentencia sumaria.[18] El inciso (a) de la Regla 36.3 de Procedimiento Civil, dispone que la moción de la parte promovente deberá contener:

> *(1)  Una exposición breve de las alegaciones de las partes;*
> *(2)  los asuntos litigiosos o en controversia;*
> *(3)  la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria;*
> *(4) una relación concisa y organizada en párrafos enumerados, de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen los mismos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;*
> *(5)  las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y*
> *(6)  el remedio que debe ser concedido.[19]*

Asimismo, presentada una moción de sentencia sumaria, la parte promovida no deberá cruzarse de brazos ni descansar exclusivamente en meras afirmaciones o en las aseveraciones contenidas en sus alegaciones.[20] Es preciso que la parte promovida formule —con prueba adecuada en derecho— una posición sustentada con contradeclaraciones juradas y contradocumentos que refuten los hechos presentados por el promovente.[21] Por

---

[16] *Burgos López et al. v. Condado Plaza*, 193 DPR 1, 17 – 18 (2015); *Mejías v. Carrasquillo*, 185 DPR 288, 299 (2012).
[17] *S.L.G. Szendrey-Ramos v. Consejo de Titulares*, *supra*, a la pág. 167. Énfasis nuestro.
[18] *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 431 (2013).
[19] 32 LPRA Ap. V, R. 36.3 (a). Énfasis nuestro.
[20] *Rodríguez Méndez v. Laser Eye*, 195 DPR 769, 785 (2016).
[21] *Ramos Pérez v. Univisión*, 178 DPR 200, 214 – 215 (2010).

consiguiente, cualquier duda que plantee sobre la existencia de hechos materiales en controversia no será suficiente para derrotar la procedencia de la solicitud.[22] Después de todo, *"[l]a etapa procesal para presentar prueba que controvierta los hechos propuestos por una parte en su Moción de Sentencia Sumaria no es en el juicio, sino al momento de presentar una Oposición a la Moción de Sentencia Sumaria, según lo exige la Regla 36 de Procedimiento Civil".[23]*

En ese sentido, la parte promovida también tiene la obligación de cumplir con las exigencias enunciadas en las cláusulas (1), (2) y (3) del inciso (a) de la Regla 36.3 de Procedimiento Civil.[24] Le corresponde citar con especificidad cada uno de los párrafos, según enumerados en la solicitud de sentencia sumaria, que entiende se encuentran en controversia, al igual aquellos que no.[25] Dicha tarea, deberá ser realizada de forma tan detallada y específica como lo haya hecho la parte promovente y haciendo referencia a la prueba admisible en la cual se sostiene la impugnación, con cita a la página o sección pertinente.[26]

Ahora bien, la inobservancia de las partes con la normativa pautada tiene repercusiones diferentes para cada una. Al respecto, nuestro Tribunal Supremo ha señalado que:

> *[P]or un lado, si quien promueve la moción incumple con los requisitos de forma, el tribunal no estará obligado a considerar su pedido. A contrario sensu, si la parte opositora no cumple con los requisitos, el tribunal puede dictar sentencia sumaria a favor de la parte promovente, si procede en derecho. Incluso, si la parte opositora se aparta de las directrices consignadas [en la regla] el tribunal podrá no tomar en consideración su intento de impugnación [de los hechos ofrecidos por el promovente].[27]*

Entretanto, es menester señalar que al ejercer nuestra función revisora sobre decisiones en las que se aprueba o deniega una solicitud de sentencia sumaria, nos encontramos en la misma

---

[22] *Oriental Bank v. Perapi et al.*, 192 DPR 7, 26 (2014).
[23] *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 122 (2015).
[24] Regla 36.3 (b)(1) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3 (b)(1).
[25] *SLG Zapata-Rivera v. J.F. Montalvo*, *supra*, a la pág. 432.
[26] *Id.; Burgos López et al. v. Condado Plaza*, *supra*, a la pág. 17.
[27] *Meléndez González et al. v. M. Cuebas*, *supra*, a la pág. 111.

posición que los foros de primera instancia.[28] Al tratarse de una revisión de *novo*, debemos ceñirnos a los mismos criterios y reglas que nuestro ordenamiento les impone a los foros de primera instancia, y debemos constatar que los escritos de las partes cumplan con los requisitos codificados en la Regla 36 de Procedimi*ento* Civil, *supra.*[29] A tenor con lo expuesto, el Tribunal Supremo insular ha pautado lo siguiente:

> *[…] el Tribunal de Apelaciones debe revisar si en realidad existen hechos materiales en controversia. De haberlos, el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos. […]*
>
> *[Por el contrario], de encontrar que los hechos materiales realmente están incontrovertidos, el foro apelativo intermedio procederá entonces a revisar de novo si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.*[30]

Desde luego, el alcance de nuestra función apelativa al intervenir en estos casos no comprenderá la consideración de prueba que no fue presentada ante el foro de primera instancia ni la adjudicación de hechos materiales en controversia.[31]

**-B-**

En primer orden, el Art. 1 de la Ley Núm. 80 del 30 de mayo de 1976, según enmendada, conocida como la *Ley Sobre Despidos Injustificados* (Ley Núm. 80),[32] establece que un empleado que: **(1)** esté contratado sin tiempo determinado; **(2)** reciba una remuneración, y **(3)** sea despedido de su cargo sin que haya mediado justa causa, tiene derecho al pago de una indemnización por parte de su patrono.[33] La aludida Ley fue creada con el propósito de proteger al empleado de actuaciones arbitrarias del patrono e imponer un remedio económico que desalentara la práctica de

---

[28] *Meléndez González et al. v. M. Cuebas, supra*, a la pág. 118; *Vera v. Dr. Bravo*, 161 DPR 308 (2004).

[29] *Meléndez González et al. v. M. Cuebas, supra*, a la pág. 118.

[30] *Meléndez González et al. v. M. Cuebas, supra*, a las págs.,118-119.

[31] *Íd.* Énfasis nuestro.

[32] 29 LPRA sec. 185a *et seq.*

[33] 29 LPRA sec. 185a.

despedir empleados sin justa causa para ello.[34] A esos fines, crea una presunción de que todo despido es injustificado y le corresponde al patrono, mediante preponderancia de la prueba, demostrar que hubo justa causa para el mismo. [35]

Se considera que es ***justa causa*** para el despido aquella que tiene su origen en alguna razón o motivo vinculado a la ordenada marcha y normal funcionamiento de una empresa y no en el libre arbitrio o capricho del patrono.[36] En específico, el Artículo 2 de la Ley Núm. 80 dispone las circunstancias que constituyen *causa justificada* para el despido de un trabajador.[37] En lo pertinente a la controversia que nos ocupa, dispone que:

> *Se entenderá por justa causa para el despido de un empleado de un establecimiento:*
>
> *(a) Que el obrero siga un patrón de conducta impropia o desordenada.*
> *(b) La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento.*
> *(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.*
> *[…]*
>
> *No se considerará despido por justa causa aquel que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento. Tampoco se considerará justa causa para el despido de un empleado la colaboración o expresiones hechas por éste, relacionadas con el negocio de su patrono, en una investigación ante cualquier foro administrativo, judicial o legislativo en Puerto Rico, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada según la ley. En este último caso, el empleado así despedido tendrá derecho, además de cualquier otra adjudicación que correspondiere, a que se ordene su inmediata restitución en el empleo y a que se le compense por una suma igual a los salarios y beneficios dejados de percibir desde la fecha del despido hasta que un tribunal ordene la reposición en el empleo.[38]*

Nuestro Tribunal Supremo ha establecido que la lista de ejemplos que contiene el mencionado Artículo 2 persigue ilustrar y

---

[34] *SLG Torres-Matundan v. Centro Patología*, 193 DPR 920, 929 (2015).
[35] *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894, 906 – 907 (2011).
[36] *Srio. del Trabajo v. G.P. Inds., Inc.*, 153 DPR 223, 244 (2001).
[37] 29 LPRA sec. 185(b).
[38] *Ibid.* Énfasis nuestro.

orientar en una forma no exhaustiva sobre el tipo de conducta que constituye la razón y motivo justificado para el despido, por estar reñido con la ordenada marcha y normal funcionamiento de una empresa.[39] En ese sentido, los patronos pueden adoptar reglamentos internos y fijar las normas de conducta en el lugar de trabajo y los empleados estarán sujetos a ellos, *siempre y cuando sean razonables*.[40] Por tanto, cuando el patrono logra demostrar que: **(1)** las reglas establecidas para el funcionamiento del establecimiento *son razonables*; **(2)** se le *suministró copia escrita de dichas normas al empleado*; y **(3)** éste violó las normas en reiteradas ocasiones, se constituye la *justa causa* para el despido.[41]

**-C-**

La Constitución del Estado Libre Asociado de Puerto Rico dispone que no podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas.[42] La Ley Núm. 69 de 6 de julio de 1985, según enmendada, conocida como la *Ley para Garantizar la Igualdad de Derecho al Empleo* (Ley Núm. 69),[43] también prohíbe el discrimen por razón de sexo. La intención de esta legislación es "garantizar la igualdad de derecho al empleo tanto del hombre como de la mujer, prohibiendo las actuaciones de los que promueven el discrimen, fijando responsabilidades e imponiendo penalidades".[44] A tales fines, el Art. 3 de la Ley Núm. 69,[45] establece, como práctica ilegal en el empleo, el que un patrono suspenda, rehúse emplear o despida a cualquier empleado por razón de su sexo.

El empleado que insta una causa de acción por discrimen por razón de sexo, establece un caso *prima facie* de discrimen contra su

---

[39] *Srio. del Trabajo v. G.P. Inds., Inc.*, *supra*, pág. 244.
[40] *Jusino et als. v. Walgreens,* 155 DPR 561, 573 (2001).
[41] *Rivera v. Pan Pepín,* 161 DP R 681, 689 – 690 (2004). Énfasis nuestro.
[42] Art. II, Sec.1, Const. ELA, LPRA, Tomo 1, pág. 275.
[43] 29 LPRA sec. 1321 *et seq.*
[44] *Ramírez Ferrer v. Conagra Foods PR,* 175 DPR 799, 813 (2009).
[45] 29 LPRA sec. 1323(1).

patrono cuando demuestra que: **(1)** hubo un despido o acto perjudicial, **(2)** se realizó sin justa causa, y **(3)** se cometió algún hecho base cónsono con la modalidad de discrimen alegada. Establecido el caso *prima facie*, surge una presunción de discrimen contra el patrono. El patrono puede rebatir la presunción probando que hubo justa causa para el despido o que el despido fue por motivos no discriminatorios, o articulando ambas defensas a la vez.[46]

**-D-**

Por otra parte, la Ley Núm. 115-1991, según enmendada, conocida como la *Ley contra el Despido Injusto o Represalias a todo Empleado por Ofrecer Testimonio* (Ley Núm. 115),[47] es un estatuto reparador que prohíbe las represalias en el contexto laboral. Esta ley protege a los empleados y crea una causa específica de acción sobre daños y perjuicios contra cualquier patrono que discrimine contra algún empleado por ofrecer o intentar ofrecer información o testimonio ante algún foro legislativo, judicial o administrativo.[48]

El empleado que insta una causa de acción por discrimen por represalia, establece un caso *prima facie* de represalia contra su patrono cuando demuestra que: **(1)** incurrió en una actividad o conducta protegida por ley; **(2)** sufrió una acción disciplinaria adversa por parte del patrono; y **(3)** que existe un nexo causal entre la conducta protegida y la acción disciplinaria o adversa del patrono.[49]

En cuanto al nexo causal, será importante analizar cuán cerca en el tiempo están la actividad protegida ejercida por el empleado y la acción adversa efectuada por el patrono. El Tribunal Supremo de Puerto Rico ha establecido que la proximidad temporal resulta

---

[46] *López Fantauzzi v. 100% Natural*, 181 DPR 92, 131 (2011).
[47] 29 LPRA sec. 194 *et seq.*
[48] *Rivera Prudencio v. Mun. de San Juan*, 170 DPR 149, 159 (2007).
[49] *Feliciano Martes v. Sheraton*, 182 DPR 368, 396 (2011).

suficiente al momento de establecer un caso *prima facie* por represalia al amparo de nuestro ordenamiento legal. Una acción adversa tomada contra el empleado inmediatamente después de que este incurra en una actividad protegida, bastará para establecer la existencia de un nexo causal entre ambos acontecimientos. En cambio, según aumenta el periodo de tiempo entre el ejercicio de la actividad protegida y la subsiguiente acción adversa del patrono, menor será la utilidad del criterio de la proximidad temporal en el establecimiento de un caso *prima facie* de represalia.[50]

En caso de que la acción adversa no ocurrió al poco tiempo de la alegada actividad protegida, el empleado deberá presentar evidencia que establezca: **(1)** que fue tratado de forma distinta a otros empleados; **(2)** que existió un patrón de conducta antagónica en su contra; **(3)** que las razones articuladas por el patrono para fundamentar su acción adversa están plagadas de incongruencias o **(4)** cualquier otra evidencia que obre en el expediente para establecer el elemento del nexo causal.[51]

Una vez el patrono logre articular una razón no represiva para la acción adversa que tomó, se requerirá del empleado que, por preponderancia de la prueba, se valga de factores adicionales a la proximidad temporal para comprobar que las razones articuladas por el patrono no son más que meros pretextos destinados a ocultar el verdadero ánimo represivo.[52]

### -III-

En **primer orden**, estamos en la misma posición que el TPI para atender una solicitud de sentencia sumaria, por lo cual procedemos a adoptar por referencia las ciento doce (112)

---

[50] *Feliciano Martes v. Sheraton, supra,* a las págs. 398-399.
[51] *Feliciano Martes v. Sheraton, supra,* a las págs. 399-400.
[52] *Íd.*

determinaciones de hechos incontrovertidos esbozados en la *Sentencia*, ya que están sustentados en la prueba que se acompañó.

Como foro apelativo, nos compete determinar si las partes cumplieron con los requisitos que impone la referida Regla 36 de Procedimiento Civil.[53] Un análisis de los documentos sometidos nos lleva a concluir que la Boys & Girls cumplió con todos los trámites procesales correspondientes a la sentencia sumaria, sin embargo, la señora Rodríguez Cosme no cumplió con ello. En específico, la parte apelada cumplió con enumerar los hechos esenciales y pertinentes, y sostener sus alegaciones con prueba admisible en evidencia. En cambio, la apelante descansó en refutar con meras alegaciones.

En **segundo orden**, nos corresponde determinar si —a tono con la Ley Núm. 80— el TPI incidió al concluir que el despido de la apelante fue justificado, ya que no estableció que fue en represalia ni por razón de sexo. No erró.

Es un hecho incontrovertido que las Reglas de Conducta de Boys & Girls disponen que el trabajar sin armonía o falta de cooperación con sus compañeros/as de trabajo, dejar de ponchar su tarjeta de asistencia ("time card") o de completar cualquier documento según requerido, y desempeñar el trabajo en forma ineficiente o hacerlo tardía y negligentemente o en violación a las normas de calidad del servicio que presta BGCPR, pudiese conllevar acción disciplinaria, incluyendo el despido.[54] Dada la naturaleza del negocio de la parte apelada, ciertamente colegimos que las reglas de conducta establecidas por la compañía son patentemente **razonables** para el adecuado funcionamiento y operación de la misma. Ello, ciertamente no se cuestiona aquí.

En ese sentido, es un hecho incontrovertido que el 1 de junio de 2018, Boys & Girls le entregó copia a la señora Rodríguez Cosme

---

[53] 32 LPRA Ap. V, R. 36.
[54] Apéndice de la *Apelación,* págs. 631 – 632.

del Manual de Políticas de Recursos Humanos y Reglas de Conducta de Boys & Girls.[55] Sin embargo, la apelante violó las normas en reiteradas ocasiones. Surge de la prueba presentada que las personas entrevistadas indicaron que fue la señora Rodríguez Cosme quien creó un ambiente incómodo.[56] En la reunión del 31 de octubre de 2019, la apelante reconoció —que en por lo menos dos ocasiones— no cumplió con la política de ponchar e indicó que no estaba cumpliendo con la entrega de los informes a tiempo.[57] Así, conforme a las circunstancias particulares en el presente caso, concluimos que el despido estuvo justificado.

En **tercer orden**, la señora Rodríguez Cosme aduce que erró el TPI al concluir que no pudo establecer su causa de acción de hostigamiento, discrimen, y ambiente hostil, por razón de su género en violación a la Ley Núm. 69. No le asiste la razón. Cónsono con el derecho esbozado, la apelante tenía que demostrar que: (1) hubo un despido o acto perjudicial, (2) se realizó sin justa causa, y (3) se cometió algún hecho base cónsono con la modalidad de discrimen alegada. Ciertamente, la señora Rodríguez Cosme demostró que es mujer y fue despedida.[58] Sin embargo, no logró demostrar que existió ánimo discriminatorio en su despido. En ese sentido, admitió que desconocía quien tomó la determinación de despedirla,[59] por lo que no se pueden ligar los alegados comentarios de su supervisor, el señor Wilfredo Damiani, con el despido de ésta.

Finalmente, la Sra. Rodríguez Cosme aduce que erró el TPI al concluir que no pudo establecer su causa de acción de represalia al amparo de la Ley Núm. 115. Tampoco le asiste la razón. A la luz de la normativa antes expuesta, la apelante tenía que demostrar que: (1) incurrió en una actividad o conducta protegida por ley; (2) sufrió

---

[55] Apéndice de la *Apelación*, pág. 640.
[56] Apéndice de la *Apelación*, págs. 395 – 396.
[57] Apéndice de la *Apelación*, pág. 658.
[58] Apéndice de la *Apelación*, pág. 556.
[59] Apéndice de la *Apelación*, págs. 438 – 439.

una acción disciplinaria adversa por parte del patrono; y (3) que existe un nexo causal entre la conducta protegida y la acción disciplinaria o adversa del patrono.[60]

La apelante demostró que presentó una queja contra su supervisor el 5 de marzo del 2020,[61] y que fue despedida por Boys & Girls el 29 de junio de 2020.[62] Sin embargo, no logró demostrar que existe un nexo causal entre la conducta protegida y la acción disciplinaria o adversa del patrono.

En este caso, la acción adversa ocurrió cuatro (4) meses después de la actividad protegida. Además, Boys & Girls articuló una razón no represiva para el despido, pero la señora Rodríguez Cosme no logró establecer, factores adicionales a la proximidad temporal para comprobar que las razones articuladas por el patrono no son más que meros pretextos destinados a ocultar el verdadero ánimo represivo.

En virtud de lo antes dicho, Boys & Girls despidió a la señora Rodríguez Cosme por su pobre desempeño e incumplimiento con las normativas de la institución y las funciones esenciales de su puesto de trabajo. Por lo tanto, es forzoso concluir que el TPI no incidió al desestimar este caso mediante Sentencia Sumaria.

**-IV-**

Por los fundamentos antes expuestos, resolvemos **confirmar** la *Sentencia* apelada.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[60] *Feliciano Martes v. Sheraton*, 182 DPR 368, 396 (2011).
[61] Apéndice de la *Apelación,* pág. 670.
[62] Apéndice de la *Apelación,* pág. 556.